Well, thank you, Council. We welcome you under these extraordinary circumstances. I guess everybody is now used to Zoom, which I guess is both good and bad. But we're very happy to be here to hear argument. And I believe we start with appellant, Mr. Berman. Yes, thank you, Your Honor. And if I could please reserve four minutes for rebuttal. Four minutes it is. Go ahead, sir. Thank you. May it please the Court. When determining whether common issues predominate over individual issues, which is required before certifying a class under Rule 23b-3, the District Court must, of course, conduct a rigorous analysis. This analysis, as this Court held just in April in the Lamettle case, means that one cannot simply take plaintiff's contentions at face value. The Court must, quote, make a prediction as to how they would play out a trial. Now, fundamentally, as shown by Lamettle and by the Supreme Court in Comcast, plaintiffs cannot satisfy their burden of showing that common issues predominate through evidence that is unusable at trial. And here, plaintiffs have no usable common evidence showing that all class members were injured by the alleged misconduct. They have no usable evidence of the aggregate damages reportedly suffered by the class as a whole. And it's undisputed that they have no feasible means to determine what damages award, if any, is owed to each member of the class. You mentioned Lamical. And in that case, we were clear that there's a difference between injury and damages. And in Modafinil, we talked about the fact that proof of aggregate damages of the unlawful conduct is fine, even if you later need to allocate. How do you square your argument with those two crests in civil court? Certainly, Your Honor. I start with the fact that Comcast, the Supreme Court case, was a damages case. And Comcast, in the main, discussed an aggregate damages model. But in one of the footnotes, footnote six, it also addressed the question of differentiating the amount of damages owed between different members of the class. But fundamentally, it's a question of simply looking at the rule. The rule says that you need to determine that common issues predominate, but damages don't count. It is true that there are many cases where different plaintiffs with different records and different evidence have found methods to allocate damages in a way that does not defeat the predominance of the common issues. But it's a fact issue in every case. It is a question of fact with the burden of proof upon plaintiffs. And you need to find, you need to have something, you need to have some evidence out there to show you that there is a feasible way of getting to the finish line. There is a feasible way of someday figuring out how much money, if any, is owed to each individual class member. But as Judge Schwartz points out, that's a matter of allocation, not a matter of what is the predominant issue. The predominant issue here is going to be the of your client, and was it violative of the antitrust laws? If you succeed in saying it wasn't, there is no issue at all as to damages. We have an allocation that can be done much as it was in the lidoderm case. But that's for another day. Dr. Lam points out that you confuse common impact with the method for allegating damages. Here, it can be said that for all in the class, they paid higher prices than they would have, but for your client's anti-competitive behavior. This is not a situation where the members of the class may not even be members because of the need for determination of their lost profits or if the merits had a reliance factor. Here, the common impact is clear, is it not? Your Honor, the common impact requires a determination that it was unlawful for records to increase the price of its tablets. Exactly. And that's the predominant issue in this case, correct? That is one of the issues in this case. Yes, Your Honor. But in order to make out an antitrust claim, a plaintiff must make out unlawful conduct and injury and measurable damages. Each of those must be proven. And if any of those elements cannot be proven through common means, if there's no feasible way of figuring out at the end of the day any of those elements... But you're not attacking Dr. Lam's... Dr. Lam's report does exactly that, a measurable way to show the aggregate damages. And you're not attacking that report on appeal, are you? Oh, we certainly are. One of the problems with the report, as stated just now, is that it attributes damages to price increases, which is defective as a matter of law. A second problem is that it attributes damages to film price discounts, which now even plaintiffs have to look at the pieces of behavior in incremental bits. And the case law directs us to look at a totality of actions to determine whether from that there's been an antitrust injury. So even if the individual act of raising prices in and of itself is not unlawful, when taken in context of the other common evidence that would come from your client about its business practices, isn't there enough in this record to determine that there is common evidence to demonstrate there's been antitrust behavior in the forms of encouraging rebates for the film, no longer encouraging it for the tablet, making comments about the safety of the tablets at just about the time the film was hitting the market, and those like behaviors that are alleged by the other side, and at least there's some facts upon which the district court could reach its conclusion that there was common evidence of a suite of behaviors that would have caused an antitrust injury, and that Dr. Lamb's report has a factual basis for that. How do you respond to that? And that's essentially what the district court's holding was. Certainly, and there's a few pieces of that. First of all, on the question of whether component parts of the alleged conspiracy were unlawful or lawful, continental law has been misapplied by the district court. Continental law says after you have determined that multiple acts were each exclusionary, you look at the combined effects of all exclusionary acts put together. As shown by the processed eggs decision that came out last week, the prior question of what acts are in fact lawful or unlawful, the mode of analysis is not all glommed together when there's an allegation of overarching conspiracy. You look at the different components separately by the appropriate legal test. So that's one issue with it. The next issue is that if you're looking at liability, is there liability for safety claims, for example? That is a common issue, and whether that's true or false on the merits is not before this panel today. That's something the district court or a jury will decide later. But it's undisputed that even if RECCIT has committed misconduct through safety claims or withdrawing the tablet product, it's undisputed there's no evidence showing that that conduct injured all... The allegation the plaintiffs have presented is that effectively people were tricked into purchasing more film and fewer generic tablets. But if you look at the class members who are mostly methadone clinics, there's no common evidence of what they were told, what they believed, what they responded. Some of them never bought film and so couldn't have been tricked into anything. Some of them never bought generic tablets. More generic tablets under different circumstances. So to piece it out, question one, what is lawful and unlawful? Pricing is lawful. The other allegations, the lawfulness has yet to be determined. On the question of is there common impact, the answer is that there's only common impact from pricing. There is no common impact from any other kind of alleged misconduct. And if you look at the aggregate damages model, it includes within it, as damages, the effect of price decreases to film. In the Surrey-Buttle brief, they admit four separate times it's perfectly lawful, quote-unquote soft switch technique to try to convince people to try your product. Let me follow up on that. Do you perceive the injury in fact or the antitrust impact alleged by the class to be related to purchases of both the tablets and the film, or is it only tablets? They have alleged that both of those things have caused damages. If you're looking for whether there is common proof of damages to class members, all class members by definition purchased branded tablets, and so all of them allegedly suffered a price increase. But on the question of whether they're injured by buying more film and fewer generic tablets, that question is not common to the class because there's no common evidence whatsoever that can be used to determine whether all these different methadone clinics in fact had their purchasing patterns affected at all by any of the alleged misconduct. All right, thanks. I guess on that point, what I was confused about is Dr. Lamb presents evidence with regard to both the class as defined by the district court is only branded tablets. And I think the sort of the language of the briefs and the complaint, it's a mixture of tablets and film. But if I understand you correctly, at the end of the day, it's really about tablets. Well, the class definition was gerrymandered to only include people who bought branded tablets. The original complaint, the allegations that everybody who bought film as well as tablets was injured. They jettisoned all the class members who bought film but not branded tablets because there's absolutely no way of showing any injury to them. And so the way the damages model is constructed is that the common injury alleged is that everyone paid a little bit more for branded tablets than they otherwise would have. And 95% of the damages claim comes from the allegation that some of the class members, not most, some of the class members bought a lot more film than they would have and a lot less generic tablets than they would have. I hope that does more to clarify than to confuse, Your Honor. I think it does. It'll be interesting to hear from your adversary. Judges Rendell and Schwartz, I'm not exact on my time, but I believe that's around 11 minutes. If you have more, please go ahead. Good, thank you. Judge Rendell? I do have a question about the control aspect. We've never imposed a heightened control requirement, control over class counsel. Can you tell us where that comes from? It comes from two very simple concepts. First of all, lawyers answers to clients, not the other way around. And second of all, the language of Rule 23A4 requires class representatives to, quote, fairly and adequately protect the interests of the class. The standard is protect. And the standard is not well-informed bystander. There's a lot of cases that talk about the need for a class representative to be at least minimally informed about the nature of the case. And that's a far cry from control. Yes, it is. And it's a different issue. One needs to be minimally informed because otherwise, one cannot protect the class if you don't know anything about the case that's in front of you. But it's equally true that you're unable to protect the class if you don't know that you were in charge of the lawyers and not the other way around, if you have no control whatsoever over the lawyers. And I'd refer to some case law in other districts. So the Berger case in the Fifth Circuit reversed a class certification of adequacy because adequacy requirements mandates an inquiry into the willingness and ability of the representatives to take an active role in and control the litigation and to protect the interests of absentees. And General Motors stated the principle, although it wasn't key to its holding, that the protection—and General Motors is a Third Circuit case—the protection of the absentee's due process rights depends in part on the extent the name plaintiffs are adequately interested to monitor the attorneys. Thank you. All right. Thanks so much, counsel. We'll get you back on rebuttal. And is it Mr. Cohn? It is, Your Honor. Good morning, members of the panel. I'm Peter Cohn. I'm counsel for all the appellees. The question before this court is whether it wants to make new class certification law in three ways that Reckitt Benkiser urges. First, Reckitt asks you to expand hydrogen peroxide to allow piecemeal appellate review of a district court's motion to dismiss denial under the guise of a 23-F proceeding. Second, Reckitt asks that we now require not just aggregate damage calculations but also plans of allocation of common funds as a condition of Rule 23b-3 certification. And third, Reckitt seeks to require this court to force class representatives to help draft pleadings and select the defendants to join in order to be found adequate under Rule 23a-4. On the first question, where Reckitt seeks to dismiss denial under Rule 23b-3, the court says that Reckitt's increase in tablet price can be part of an overarching anti-competitive scheme under Section 2. Let me ask a question before you get into that. So I just want you to resolve this sort of film tablet issue that I am working through. So Reckitt speaks of individualized considerations as antithetical to predominance and ultimately certification. So one theoretical example is when Dr. Lamb speaks of injury in fact to those who purchased both tablets and film. Are film purchasers a subset of the class that was certified by Judge Goldberg or should such purchasers be thought of as a separate class that are not part of this case? Judge Greenaway, those direct purchasers only of the film are not part of the class. The class is defined as direct purchasers of Reckitt's branded tablets. It is those direct purchasers of branded tablets who were targeted by Reckitt Benkiser's conduct in this case. Conduct to suppress generic competition by forcing, coercing prior to the advent of a generic tablet. Forcing and coercing those tablet purchasers to buy more and more film by shifting the market over to film using its coercive multi-pronged scheme. So does that mean that the theory is that if you are a brand tablet purchaser who then had to shift over to film, there are several components. But just for our purposes, let's make it simple. There are two components to your potential damages, right? The damages that arise from the purchase of tablets with the various conduct affecting it in various ways and the damages that arise from the consequent purchase of film. Am I, is that what? I think that that's roughly accurate. There's actually three measures of damages and I'm going to go through them one by one. One is there's everybody paid more for the tablets they purchased as a result of the tablet price increases that were part of the scheme. Number two is that tablet purchasers were deprived of their ability to buy cheaper generic tablets because of the delay that Rackett's conduct caused in generic entry using the part of the scheme that targeted the REMS creation process. And then the third impact, the third measure of damage to the tablet purchasers is that some portion, not all of it, but some portion of the film that they bought would have been instead generic tablets. And that the reason that it was not generic tablets is that Rackett Benkiser's six prong scheme caused them to be, because demand is derived, caused them to end up buying increasing amounts of film because doctors and patients and managed care were all coerced into not buying tablets anymore and instead buying film. So there's three impacts. And once you move to film, the generic tablet can't be substituted, correct? Because the prescription's different. That's exactly right. And that is the entire purpose of a product top scheme. And in fact, Judge Rendell, Arita and Hovenkamp have taken a look at product top schemes and have, just as this court has, decided that product top schemes are anti-competitive when they coerce purchasers because of the very dynamic that Your Honor refers to. The dynamic in particular is the fact that, as the FTC says, in order to have a meaningful, in order to have a meaningful generic market, there needs to be a branded prescription base existing to be substituted onto. You made a comment that your adversary is asking us to add to the requirements for class certification a plan for individual allocation of damages. And you're aware that our circuit has the unique consideration of ascertainability. Is there any lifeblood to your adversary's argument out of our view about ascertainability? I know one goes to identifying who's actually a member of the class who's been injured. The other goes to damages. But do you think there's any overlap in those two concepts? And if not, tell me why. And then the final question I have on this subject is, tell me your best case that says why you're, in this circuit, why your adversary is wrong about the need for an allocation plan. So yes, I'm happy to do that. In some ways, Judge Schwartz, I'm the wrong lawyer with the wrong case to be asking questions about ascertainability. But I'm going to try to answer your honor's question. We're direct purchasers. As a consequence, the defendant's sales data almost always identifies who our class members are. So we know our 72 class members. We know their addresses. That said, I think it's very clear from the Supreme Court's decision in Tyson Foods that allocation plans, even if there's some question as to ascertainability, are supposed to be reserved for the end of the case. And the reason that I conclude that is because of the necessary inference that is drawn from the procedural posture of Tyson Foods at the time that it was decided. It was decided after a verdict. So it was decided well after class certification had been decided. And in that case, Justice Kennedy, writing for the majority, said that even at that time, it was premature to determine the ways of distributing the award and figuring out who the injured versus uninjured plaintiffs were. He went on to say that the petitioner in the case, who was the defendant, may raise a challenge to the proposed method of allocation when the case returns to the district court for dispersal of the award. That's a very late stage point for allocation to be made. And it's been endorsed by the Supreme Court in one of the latest class certification decisions that it has issued. That may be correct. But I'm curious as to why you haven't proffered and Dr. Lamb couldn't simply proffer a way to do allocation. To me, I think you're correct. The data is there. This is not an issue where you just don't know what everybody bought. You do, and you're going to have claim forms. And it seems to me there could have been an easy statement saying, this is a no-brainer. This is not the substance of this case. This is at the end of it, how to whack up the pot. And you have all the data needed to do that. I don't know. I was just curious as to why you haven't urged that it's really not a big deal. And maybe it is. Maybe on rebuttal, your opponent will say it is a big deal. But it would seem to me that there's data there from which this can be determined. Yeah, you're right, Judge Rendell. And we made a mistake. And the mistake is what I'm going to Goldberg with the motion for class certification. I know this court has full access to the underlying docket. So the ECF number for the underlying docket is 473-4, which is our trial plan. At page 7, our trial plan talks about allocation. And it says the following. Allocation of monies recovered under the judgment would take place upon usual proceedings for the allocation of such recovery in matters such as this, prorated to each class member in proportion to its purchases of brand and or generic Suboxone. It would be a lot like lidoderm. Now, lidoderm wasn't a product hop case, but Nemenda was. And the court can actually see that Dr. Lamb, who was the expert as well in Nemenda, which was a product hop plus delay case just like this one, that was venued in the Southern District of New York before Chief Judge McMahon. He was the economic expert. His plan of allocation was just approved recently by Judge McMahon. The court can see that. The Southern District of New York docket number is 15-7488. And it's located, Judge McMahon's order is at ECF 947. And she discusses Dr. Lamb's allocation plan at pages 14 to 16. And you can find his allocation plan in that case, which would be very similar to that in this case. But Your Honor is correct. It is a prorated allocation that's based on the purchases of brand Suboxone tablets and brand Suboxone film. And so does, is your position that doing a prorated division of the damage award, whatever it might be, takes away any need for individualized decision making? Absolutely. I don't, there's, the prorated allocation plans that we've done are formulaic. And as a consequence, there's, there's really no need for any individual determinations. In the claims administration process, there are times when particular class members will challenge the amounts of brand or generic of the particular drug that defendant sales data attribute to them. They have that opportunity under our claims administration process. And the claims administrator in those rare events does adjudicate those claims. And the district court ultimately hears those, but has never had to in any case that I've ever been involved in or know of. So yes, there's never a need for individualized determinations because it's all done in a formula. That formula is put to the class members with an opportunity to object. That's another reason why I think allocation is, should, should be after class certification, because, and at the end of the case, because it's really something that the proposed class members need to know about when they're contemplating objecting to a settlement, for instance, because the, the plan of allocation is under due process. One of the things, along with the settlement, the fairness of the proposed attorney's fees, that class members can object to and can write to the court about. Would you acknowledge that this case is different from a case in which the class is defined as those who have lost profits? Absolutely. You know, under, under this court's cater decision, which is a case that Judge Greenaway knows about because he was the before it went to the Third Circuit, it's very clear that direct purchaser cases for overcharges under Section 4 of the Clayton Act, like this one, are very different from, from lost profits cases, that plaintiffs need not seek lost profits, and that as we see in cases like Broussard from the Fourth Circuit, which is the seminal decision on the class certifiability of lost profits cases, they're, they're difficult to certify. We do not seek lost profits. Judge Schwartz? Good, thank you. Judge Rundell? I have nothing further. All right. Counsel, thank you very much. We'll have Mr. Berman back for rebuttal. Go ahead, sir. Thank you, Your Honor. Quickly, first of all, the merits of whether or not what Reckitt did was an illegal product top is not before this court. There is only one other product top case to show up in the Third Circuit so far. That was the Dorix case involving, involving Mylan, and this court affirmed the grant of summary judgment, and we certainly hope that the district court will follow that path in future proceedings. Second of all, you heard Mr. Cohn speak about the coercive effects of Reckitt's alleged conduct, that supposedly we coerce the shift of the market, in fact, the engine of their, of their damages model. The problem is that their damages model is a law with both their own admissions and with the law. They admitted, sur repli brief, pages 5, 7, and 10, the illegal hard switch conduct does not and co-pay coupons are two examples of soft switch tactics. And the law is the same. All of the law about the cost, price cost test says that a discount that does not go below the manufacturer's cost, which is not the case here, is lawful. And the problem with that is that their evidence incorporates within it a theory that's at war with this. Their evidence, Dr. Lam's report, says that the discounts, the coupons, the rebates were exclusionary, were a cause of the damage. And that's exactly what the district court found as a factual matter. At page 19, the plaintiffs contend that the entirety of Reckitt's hard switch scheme resulted in the antitrust injury at issue. That conduct included not only the increase in the price of tablets and decrease in the price of film, but also other things. Dr. Lam relies on the combination of those theories to set forth his model of antitrust damages. This model incorporates as damages, pricing conduct, both discounts and price increases, and the law and their own admissions say that he's not allowed to do that. That evidence is defective, cannot be used. We're exactly in the Comcast situation. Now, let's talk about Comcast for a second. Comcast was a case about different types of injuries caused by whatever behavior was at issue. Decreased in market penetration was a type of injury. Reduction in benchmark competition, increased bargaining power. This case is about one type of injury that, according to the plaintiffs, because the generic entry was contend that that event happened, that injury happened because of these combination of actions together. Explain to me why Comcast is not different when Comcast was about types of injuries and this disconnect between the one injury that was allowed to proceed and the report at issue that chatted about the others that were not. Because here we have injury that is alleged from lawful causes. Injury that was caused by the decrease in the price of film. And Comcast was the same. Comcast started with four theories of liability that the plaintiffs thought were viable. Three were tossed out. One remained. The damages model, however, did not go back and adjust to say, I'm now going to adjust to recognize that three kinds of conduct were legal and only look to what damages were created by the illegal conduct. So you're calling the behavior in Comcast, I just want to make sure we're talking the same language, you're causing the behavior in Comcast, that reduction in competition, the increase in bargaining power as actions, not results of the antitrust behavior. Because I think I'm looking at more as those are antitrust injuries, decrease in market penetration, increase in bargaining power as compared to changing the rebate structure, increasing the prices, making disparaging remarks about the product, the REMS behavior, the alleged citizen's petition as acts as compared to injuries. And maybe that's where we're reading Comcast differently. So help me. The key injury that drives the damages model is how much more film was purchased than would have been purchased but for the challenge conduct. And some of that increase in film purchasing was driven by perfectly lawful film discounting and perfectly lawful tablet price increases according to their own experts. This is their experts saying this. And some of the increase in film, according to their expert, we dispute, but potentially could have been the result of conduct that remains a possible source of lawful conduct in the case, the alleged disparagement, the alleged product. But you're trying to chip away at their theory, but there is only one theory here. And the expert report matches and addresses that theory. In Comcast, there were four theories, only one of which was found to be viable. And unfortunately, the expert opined as to test all the theories. So there was a mismatch. How is there a mismatch here? Well, take a look at your honor at the process eggs decision from last week. The plaintiff can call something one theory, one unified, but you're alleging different kinds of conduct that make up this one conspiracy. You look separately at each kind of conduct to determine whether or not it is lawful. And if some of the conduct is lawful and some is unlawful, you have to disaggregate the effects of what is lawful and what is unlawful. But as Judge Lewis said earlier, we don't look at these things individually. We look at the whole relate to the other conduct. So by virtue of your saying that we do partition it, if you will, that's really not what we do. Well, that's in fact what the court did in process eggs. It's in fact what the court did in the pages where there's one section of the pages that taught that examines whether a strand by was the bundling anti-competitive or exclusive contracts anti-competitive. And it's only after the third circuit found that both kinds of contact were exclusionary that you then went to a completely different section that said let's talk about the combined injury of the exclusionary acts taken together. But the real takeaway from the pages is that price manipulation has to be considered as part of the whole scheme. I mean that's really the takeaway from that case. When you're looking at the injury, that's what it says in section five of that case. If you go back to section four of that case, that's where they determine whether the different strands of the conduct were exclusionary or not exclusionary. That's the pages 152 to 159. It's taken the two parts of the overarching scheme one by one. Is this exclusionary? Is that exclusionary? And after finding that they're both exclusionary, then you get to section five with the language that you're thinking of. The Bongiorno case from the third circuit also did exactly this mode of analysis. It said at page 813, the liability jury properly found causation from only those acts which could evince the defendant's willful acquisition or maintenance of a monopoly. In finding causation, the jury must find the nexus between the act and the injury. Once a jury has properly found causation of antitrust injury from unlawful activity, however, the damages in this case may be determined without strict proof of what act caused which injury as long as the damages are not based upon speculation or guesswork. If you have multiple acts that are all exclusionary, you can lump them all together and look at the combined effect of all exclusionary acts. Before you get there, before the pages got there, before Bongiorno got there, under the methodology of processed egg products from last week, before you get to lumping together exclusionary, you have to look at what is exclusionary and what is not exclusionary. In that analysis, you do conduct by conduct, judging each by the standards established by the case law. So the pricing aspects of this case either were or were not exclusionary, and you judge that by the price-cost test. The product acts were or were not unlawful, and they'll be judged by the standards set out in the Doric's case. The disparagement was or was not unlawful, and that'll be judged by the case law that talks about how you deal with alleged false statements in antitrust cases. That is the method of analysis that's compelled by processed eggs that was followed by this court in the pages in Bongiorno. And that's necessary because of all the cases that talk about the need to disaggregate the effect of lawful conduct from the effect of unlawful conduct. Comcast, of course, is simply one example of that, but there's a whole string of cases that we cite in our briefs about the need to disaggregate. Avaya, when you had a jury verdict that was based on a theory that's viable and a theory that's not, you have to throw out the damages part because you need to disaggregate. Holman Motor Company, same thing. Plaintiffs' own experts conceded the damage figures they tendered were attributable, at least in part, to the lawful competition. Just one moment. To an observer, Judge Rendell, this seems like it's off of your topic a bit, but I will defer if it's not. I'm sorry. What am I missing? It seemed like Mr. Berman was drifting off topic of what you had asked, and I just wanted to make sure that my perception was right. If not, I'll let him go. You agree he's drifting? Yes, I do. I try not to argue with counsel.  I just think that different acts are different from theories as in Comcast. Again, we get back to Judge Schwartz's comment that this is not just about a price-cost test. You have to look at the entire scheme, and I think that the case law that I've looked at makes that clear. Mr. Berman, you're citing other case law. I don't want to argue with you, but we'll look at what you have proposed. I appreciate that, Your Honor. I guess that means, sadly, our time has come to an end. Thank you, Your Honor. I appreciate you're hearing me remotely in these strange times. Listen, of course, it's our pleasure, and this is my first Zoom argument, so I feel very excited about it. It went well. Yes, yes, yes, and I particularly like the background of Judge Rendell. Counsel, we'll take the matter under advisement. Thank you very much, and I wish much good luck to you and your families as we all try to keep safe during these trying times. Thank you, Your Honor.